UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
ERIC CLAUDIO,

                    Petitioner,

      - against -

LEONARD A. PORTUONDO,
Superintendent, Shawangunk Correctional
Facility

                    Defendants.
------------------------------------------------------- x

**MEMORANDUM & ORDER**

01 CV 5180 (RJD)

DEARIE, District Judge.

       Pro se habeas petitioner Eric Claudio moves this Court to vacate its September 30, 2002 judgment denying and dismissing his petition, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, because Respondent did not submit the full trial record to either this Court or the Second Circuit Court of Appeals, which affirmed based on "each party's rendition of the record that was not specifically controverted by the other party." Claudio v. Portuondo, 74 F. App'x 120, 123 (2d Cir. 2003). We deny the motion because it was not brought within a reasonable time, because Respondent's failure to include the trial transcript and state court briefing did not violate Claudio's due process rights, and because we have reviewed the trial transcripts and briefs and determined that the Second Circuit did not misapprehend the proofs presented at Claudio's trial, despite not having those materials at hand.

## BACKGROUND

       The Supreme Court of the State of New York entered judgment against Claudio on March 13, 1997, convicting him of second degree murder and sentencing him to a term of

imprisonment of twenty-five years to life. (Pet'r's Rule 60(b) Mot. Ex. A, at 25, ECF No. 21).[1]

We recite the following summary of the facts underlying that conviction from the Second

Circuit's opinion affirming this Court's judgment:

> On December 14, 1994, the petitioner and the victim, Steven Williams, had an argument over gambling. The next evening, Williams and his friends Hand and Tompy met to go to the store for some drinks. Williams and Tompy started walking towards the store, and Hand stayed back to wait for another friend. While walking, Williams and Tompy encountered the petitioner's friend and co-defendant, Curtis Evans. Evans and Williams began to argue, and Evans punched Williams in the face, causing him to fall to the ground, where he lay motionless. Evans then straddled Williams and hit him in the face repeatedly.

> The petitioner then arrived at the scene and, while Williams was still on the ground, proceeded to kick him in the face and stomp on his head repeatedly. Evans and Tompy then began to argue, but the petitioner continued to kick Williams in the face. When Evans turned back towards Williams, he reached into Williams' jacket and found his gun. After punching Williams a few more times, Evans ran off, and the petitioner continued to kick Williams. The petitioner then took Williams' bracelet, beeper, and money, and left.

> Hand, who had shown up around the time Evans found the gun, went over to Williams and saw that he was lying unconscious on the ground, breathing hard, and bleeding from his face. A police car and ambulance arrived, and a paramedic said that Williams "looked close to if not ready to expire." Williams was comatose when he arrived at the hospital, and he died several weeks later on January 25, 1995.

Claudio, 74 F. App'x at 122.

The Appellate Division affirmed the judgment of conviction, People v. Claudio, 702

N.Y.S.2d 836 (App. Div. 2000), and the New York Court of Appeals denied leave to appeal on

May 4, 2000. People v. Claudio, 95 N.Y.2d 794 (2000). Claudio's subsequent habeas petition to

this Court challenged the state courts' determination that sufficient evidence supported his

---

[1] That citation refers to the transcript of Claudio's oral motion to set aside the verdict and the trial court's sentence, attached to his Rule 60(b) motion as Exhibit A. For clarity, we will hereinafter cite this portion of the record as "Sentencing Tr." rather than cite to Exhibit A. Claudio has also filed the consecutively paginated trial transcript in five volumes, though not as individual Exhibits.

conviction. (Pet. 2, Dkt. No. 1). He directed this challenge at two asserted weak points in the

state's proof of second degree murder: a lack of evidence demonstrating his intent to kill, and a

lack of evidence establishing causation. (Pet. 5); (Pet'r's Mem. Supp. Pet. 2, Aug. 3, 2001, Dkt

No. 2).

Claudio's present motion seeks to revive this challenge and so we describe it in greater

detail. (Pet'r's Rule 60(b) Mot. 4-5). In Claudio's view, the medical evidence proved that

Williams died from a Diffuse Axonal Injury ("DAI") to the brain. (Pet'r's Mem. Supp. Pet. 11-

13, 17). The fatal DAI could only have resulted from a blow to Williams' face, inflicted while

Williams was standing. (Id. at 12). Evans, the co-defendant, had struck the only such blow,

knocking Williams to the ground and then striking him repeatedly after he collapsed to the

pavement. (Id. at 3-4). Accordingly, Claudio argued that he did not causally contribute to

Williams' death because, although Williams lived for weeks after the attack, his death was

certain the moment Evans first stuck him, regardless of Claudio's subsequent participation in the

attack. (Id. at 3, 17); (Sentencing Tr. 8-9); (Pet'r's Rule 60(b) Mot. Ex. B, at 24).[2] At times,

Claudio has also argued that the freak nature of Williams' injury, coupled with the spontaneity of

Evans' initial punch, both negates the inference that Evans meant to kill Williams and also shows

that Claudio had no intent to kill when he struck the already mortally wounded Williams.

(Sentencing Tr. 11-14); (App Div. Br. 18-19); (Pet'r's Mem. Supp. Pet. 20-22).

Whether couched in terms of causation or in terms of intent, the theory depends on the

same view of the medical evidence relating to the DAI. And, in its initial motion to dismiss the

---

[2] The moving brief filed with the Appellate Division by Claudio's attorney in support of his
appeal, attached to the motion as Exhibit B, which we will hereinafter cite as "App. Div. Br."
Claudio also filed a pro se supplemental brief with the Appellate Division, attached as Exhibit C.

petition, Respondent did not contest that view of the evidence. (Resp't's Mem. Supp. Mot. Dismiss Pet. 6, Feb. 20, 2002, Dkt. No. 9). Rather, Respondent contended that Claudio's petition was untimely under 28 U.S.C. § 2244(d)(1), which is the one-year limitations period set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). (Id. at 10). The Court agreed with Respondent, concluding that the state judgment of conviction became final on August 2, 2000, when Claudio's time to seek a writ of certiorari expired. (Mem. and Order 2, Sept. 25, 2002, Dkt. No. 12). Claudio had filed his petition on August 3, 2001, a single day late, and so we denied the petition as untimely. (Id. at 2).

Nevertheless, the Court issued a certificate of appealability on the merits. (J. 1, Sep. 20, 2002, Dkt. No. 13). Respondent, having focused entirely on the timeliness of the petition, filed none of the state trial or appellate court briefs with this Court, and filed no trial transcripts, even though the Court's original Order to Show Cause directed Respondent to file these materials if "available." (Order Show Cause 1, Nov. 19, 2001, Dkt. No. 4). Accordingly, with nothing in the record to draw upon other than Claudio's Memorandum of Law, we felt constrained to give Claudio the benefit of doubt on whether he had "'made a substantial showing of the denial of a constitutional right' under 28 U.S.C. § 2253(c)(2)." (Mem. and Order 2). The Court therefore issued the certificate. We also instructed Respondent to file "copies of all available briefs submitted by petitioner and the District Attorney on appeal or in connection with state collateral proceedings" with the Court. (Id. at 3).[3]

On appeal, Respondent broadened its opposition, not only arguing that Claudio's petition was untimely, but also challenging Claudio's view of the medical evidence and causation, while arguing that the severity of the attack by itself sufficiently demonstrated his intent to kill.

---

[3] The Court has inspected the original file and confirmed the absence of these materials.

(Resp't's Appeal Br. 37-45, June 2, 2003). Respondent further pointed out that, even if Claudio's theory of causation were correct, Claudio's conviction could stand on the theory that he acted in concert with Evans. (Id. at 41-42).

On review, both parties also urged the Second Circuit to expand the certificate of appealability and consider the timeliness of Claudio's petition (including the question of whether a habeas petitioner may bring a claim of actual innocence outside the limitations period). Claudio, 74 F. App'x at 121. The Second Circuit declined, addressing only the merits, and agreeing with Respondent that Claudio's challenge to the sufficiency of the evidence failed. Id. at 122. Specifically, the Second Circuit narrowly held that Claudio's theory of causation was not correct: even assuming that DAI killed Williams, a rational trier-of-fact could have determined that Claudio's kicks and stomps contributed to the DAI, and therefore contributed to Williams' death. Id. at 123. The court also concluded that the trier of fact could "readily infer from the nature of the petitioner's beating of Williams that the petitioner had the requisite intent to commit intentional murder." Id. The court did not reach the theory that the Claudio acted in concert with Evans. Id. at 123 n. 1.

In reaching these conclusions, the Second Circuit drew upon the same limited record as this Court. Id. at 123; (Index R. Appeal 3-5).[4] Respondent had not heeded this Court's instructions to file the state court briefing, explaining in a letter to the Second Circuit that "as the

---

[4] The Index to the Record on Appeal states that two documents Respondent submitted to this Court in support of its motion to dismiss were not forwarded to the Second Circuit: an affidavit by Respondent's counsel and Respondent's Memorandum of Law. We are not entirely sure that the Index is correct, because both of those filings (though separately docketed) were bound within a single document that started with Respondent's Notice of Motion, Docket Entry #7. The Index confirms that the Notice of Motion was forwarded to the Second Circuit, suggesting that the affidavit and memorandum were forwarded as well. Nevertheless, we will take it as fact that only the Notice of Motion, and not Respondent's affidavit or memorandum, was forwarded to the Second Circuit.

timeliness of the petition can be determined by this Court without reference to the state court transcripts and briefs, there is simply no need for these documents." (Resp't's Letter 1, Nov. 15, 2002, Dkt No. 16). Claudio brought this delinquency to our attention and to the attention of the Second Circuit. (Pet'r's Letter Appl. 1, Nov. 26, 2002, Dkt No. 16). He asked this Court to sanction Respondent; we denied that application. (Id.) Lacking the transcripts and state court briefing, the Second Circuit explained that it drew its understanding of the underlying facts and evidence solely from the briefing. Claudio, 74 F. App'x at 123 ("We note that, because neither party presented to the district court or to this court a full record of the state court proceedings, we have based our determination of the petitioner's habeas claim on each party's rendition of the record that was not specifically controverted by the other party.")

Approximately nine and a half years later, Claudio, prompted by the Supreme Court's ruling in Cullen v. Pinholster, 131 S. Ct. 1388 (2011) moved this Court to vacate its judgment pursuant to Rule 60(b), arguing that we should reopen the matter because Respondent's failure to provide the full record rendered the habeas proceedings deficient. Respondent has filed no opposition.

## ANALYSIS

The Court begins by briefly addressing the question of whether we have jurisdiction under AEDPA to decide Claudio's motion. That question turns on whether the motion, although

captioned as a Rule 60(b) motion, is in actuality a second or successive habeas petition.[5] <u>See</u> <u>generally</u> <u>Gonzales v. Crosby</u>, 545 U.S. 524, 528-536 (2005). Obviously Claudio brings the motion because he wishes to eventually set aside his conviction in state court. However, for the moment, Claudio only asks the Court to set aside the habeas judgment so that we may take a fresh look at the matter with the aid of a complete record, an inquiry he argues is mandatory under <u>Cullen</u>. Should the Court agree, "[t]he grant of [Claudio's] motion would not have the effect of invalidating the state conviction. It would merely reinstate the previously dismissed petition for habeas, opening the way for further proceedings seeking ultimately to vacate the conviction." <u>Rodriguez v. Mitchell</u>, 252 F.3d 191, 198 (2d Cir. 2001). Accordingly, even though Claudio's Rule 60(b) motion is "undoubtedly a step on the road to the ultimate objective of invalidating the judgment of conviction," <u>Id.</u> at 198, it takes the form of a procedural attack directed to "the integrity of the federal habeas proceeding, not to the integrity of the state criminal trial." <u>Id.</u> at 199; <u>See also</u> <u>Graves v. Phillips</u>, 811 F. Supp. 2d 601, 603-04 (E.D.N.Y. 2011), <u>aff'd</u> 531 F. App'x 27 (2d Cir. 2013). Claudio's Rule 60(b) motion is therefore not a second and successive petition, and the Court may decide it.

---

[5] Under AEDPA, the district courts have no authority to hear a second or successive state habeas petition. 28 U.S.C. § 2244(b). Rather, a second or successive petition must be filed with the appropriate court of appeals, which must authorize the district court to proceed. 28 U.S.C. § 2244(b)(3). In the Second Circuit, when a petitioner mistakenly files a second or successive petition in the district court, the court must transfer the petition to the Second Circuit rather than dismiss the petition outright. <u>See, e.g.</u>, <u>Torres v. Senkowski</u>, 316 F.3d 147, 151 (2d Cir. 2003). This AEDPA "gatekeeping" provision, <u>Id.</u> at 150, thus partially clashes with Rule 60(b), the language of which permits both challenges that would constitute an impermissible second attack on the merits of the judgment of conviction and challenges directed at some defect in the habeas proceedings themselves. <u>See</u> <u>Gonzales</u>, 125 S. Ct. at 529-31; <u>Harris v. United States</u>, 367 F.3d 74, 79-80 (2d Cir. 2004) (discussing this conflict in the context of a § 2255 petition). Presented with the former, the district court must either transfer the Rule 60(b) motion to the court of appeals (possibly after affording the petitioner a chance to avoid transfer by withdrawing the motion) or deny the motion as outside the scope of Rule 60(b). <u>Id.</u> at 82. Presented with the latter – an attack on the integrity of the habeas proceedings – the district court should rule on the motion. <u>Id.</u>

# I

Next we ask whether the motion, which Claudio filed approximately nine and half years after the Second Circuit affirmed, is timely. Rule 60(c)(1) states that any motion brought under Rule 60(b)(1-3) must be filed within a year, a bar that is "absolute." Warren v. Garvin, 219 F.3d 111, 114 (2d Cir. 2000) (quoting 12 James Wm. Moore, Moore's Federal Practice § 60.65[2][a] at 60–200 (3d ed.1997)). In contrast, motions brought under Rule 60(b)(4-6) must be filed within a "reasonable time."

Claudio brings the motion pursuant to Rule 60(b)(4), which authorizes relief from void judgments. Occasionally, however, litigants on both sides of habeas practice have mislabeled Rule 60(b) motions in an attempt to avoid the absolute one-year bar set forth in Rule 60(c)(1). Compare Id. at 114-15 (concluding that § 2254 petitioner's putative Rule 60(b)(6) motion was in fact an untimely Rule 60(b)(1) motion) with Stevens v. Miller, 676 F.3d 62, 68 (2d Cir. 2012) (concluding that the state's Rule 60(b)(6) motion was "nothing more than a late Rule 60(b)(1) motion."). When the district court determines that an untimely Rule 60(b) motion is "masquerading" in this manner, the court should deny the motion. See Id. at 67; Brown v. Combs, 241 F. App'x 761, 762 (2d Cir. 2007).

Claudio has not mischaracterized his motion. The motion is certainly not a stealthy Rule 60(b)(1) motion based on mistake or neglect, because the State's decision not to file the briefs and transcripts was quite deliberate. Moreover, although one might argue that Claudio's motion fits better under Rule 60(b)(3), insofar as it is based on the State's "misconduct" in deciding not to file those materials, we conclude (for reasons that will become more apparent when we

address the merits) that Claudio has properly characterized the motion under Rule 60(b)(4). The Court therefore assesses whether Claudio filed the motion within a "reasonable" time.

Superficially, nine and a half years looks like far too long of a delay, well beyond the fatal three-and-a-half year delay in Rodriguez, 252 F.3d at 201, and approaching the unexplained fifteen year delay in Washington v. Hirsch, 2011 WL 4711879, at *2 (E.D.N.Y. Oct. 5, 2011), aff'd 472 F. App'x 55 (2d Cir. 2012), a Heck-barred § 1983 case. However, Claudio's argument rests not only on Respondent's failure to comply with this Court's directives and the applicable rules of court, but on what he asserts is the rule of decision laid down in Cullen. Assuming that Claudio is correct, and that Cullen did indeed impose an obligation upon the courts to consider the entire state court record when ruling on a § 2254 petition (again, an issue we discuss in greater detail infra), Claudio's entitlement to relief under Cullen (if any) vested only when the Supreme Court decided that case on April 4, 2011. His Rule 60(b) motion followed that decision by just under two years, which makes the overall reasonableness of Claudio's delay a closer question. But the Court concludes that this shorter delay also exceeds the boundaries of reasonableness under Rule 60(c)(1). Cf. Kellogg v. Strack, 269 F.3d 100, 104 (2d Cir. 2001) (twenty-six month delay in filing Rule 60(b) motion after entry of judgment is unreasonable); United States v. Cleaver, 319 F. App'x 728, 731 n. 2 (10th Cir. 2009) (two year delay is unreasonable for Rule 60(b) motion brought by § 2255 petitioner challenging district court's dismissal of petition without permitting him to reply). We therefore deny the motion as untimely.

## II

In the alternative, we next consider whether the judgment is "void" within the meaning of Rule 60(b)(4) because the State did not submit the briefing and trial transcript. "A judgment is

void under Rule 60(b)(4) of the Federal Rules of Civil Procedure . . . if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law." City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 138 (2d Cir. 2011) (alteration in original) (internal quotation marks omitted) (quoting Grace v. Bank Leumi Trust Co. of N.Y., 443 F.3d 180, 193 (2d Cir. 2006)).[6] Accordingly, in habeas proceedings, Rule 60(b)(4) relief is not appropriate except in the "'rare instance'" in which a due process violation infects the habeas proceedings. Graves, 531 F. App'x at 29 (quoting United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 271 (2010)). Our review of the case law in this Circuit confirms that such instances are not only rare, but virtually non-existent. See, e.g., Fuentes v. LaValley, 2014 WL 726696, at *3-4 (E.D.N.Y. Feb. 24, 2014) (rejecting claim that judgment denying petition violated due process because of racial and gender bias of presiding judge); Lorenzana v. United States, 2013 WL 4400526, at *3 (S.D.N.Y. Aug. 15, 2013) (rejecting claim based on lack of evidentiary hearing on ineffective assistance of counsel claim).

Still, Claudio's motion is cognizable under Rule 60(b)(4) because it implicates "[t]he fundamental requisite of due process of law . . . the opportunity to be heard[.]'" Ford v. Wainwright, 477 U.S. 399, 413 (1986) (first alteration in original) (quoting Grannis v. Ordean, 234 U.S. 385, 394 (1914)). Yet, even though Respondent engaged in technical violations of the rules, Claudio's claim of a due process violation falls short. True, in our original Order to Show Cause, we directed Respondent to file both the transcripts and the state court briefing, if

---

[6] Claudio appears to raise only procedural defects, not a jurisdictional defect. Indeed, arguing a jurisdictional defect would appear self-defeating. After all, if the Court somehow lacked jurisdiction to entertain the petition in the first place, we would be required to vacate the judgment, but would seemingly have no jurisdiction to reconsider the original petition. That would leave Claudio at the mercy of AEDPA's statute of limitations and (possibly) its bar on second and successive petitions – exactly the same effect as denying the motion outright.

available. And we reiterated our order to file the briefing (though not the transcript) in the Memorandum and Order denying the petition. Moreover, Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts stated at the time (that is, prior to its most recent amendment in 2004) that "[t]he answer shall indicate what transcripts (of pretrial, trial, sentencing, and post-conviction proceedings) are available, when they can be furnished, and also what proceedings have been recorded and not transcribed."[7] Rule 5 also stated that the respondent "shall" file "a copy of the petitioner's brief on appeal [in state court] and of the opinion of the appellate court." Respondent never fully complied with our orders or with Rule 5, even though its citation to the trial transcript throughout its subsequent brief on appeal indicates that portions of the transcript were available (indeed, the most important portions, those transcribing the testimony of the key eyewitness and the medical examiners). (Resp't's Appeal Br. 6-10, 44).

Even so, we cannot view Respondent's carelessness as so extreme that it violates due process. Crucially, at the time the petition was under review, Rule 5 did not absolutely require the respondent to file the trial transcript. Moreover, although Rule 5 did require the respondent to file the state court briefing with its answer, the Rules of Civil Procedure also authorize respondent to file instead a motion to dismiss on procedural grounds, including failure to file within AEDPA's statute of limitations. See, e.g., Purdy v. Bennett, 214 F. Supp. 2d 348, 353 (S.D.N.Y. 2002) (district court may permit respondent to file motion to dismiss pursuant to Rule 12(b)(6)). Ultimately, then, despite our two orders and the requirements of Rule 5, the worst that can be said is that Respondent should have first sought leave of court before filing its motion to

---

[7] Page 2 of Claudio's Memorandum of Law (filed with his Rule 60(b) motion, but not entered on ECF) instead cites the pre-2004 version of the Rules Governing Section 2255 Proceedings in the United States District Courts (that is, the rules applying to habeas petitions directed at federal convictions).

dismiss in lieu of an answer conforming with the rules. And that failure did not go unnoticed at the time. On the contrary, both this Court and (impliedly) the Second Circuit determined that the petition could move forward on the merits even after Claudio notified both courts of Respondent's continued dereliction via letter. Finally, we note that Claudio's counsel also had access to the transcript. Like Respondent, counsel cited the transcript throughout his original briefing. (Pet'r's Mem. Supp. Pet. 5-15). In these circumstances, we cannot conclude that Claudio was deprived of the opportunity to be heard.

Claudio bolsters his due process argument by citation to <u>Cullen</u>. According to Claudio, <u>Cullen</u> held that "<u>the state court record was that considered by the state courts</u> for the habeas court to adjudicate the petition." (Pet'r's Mem. Supp. Rule 60(b) Mot. 3). But in <u>Cullen</u>, 131 S. Ct. at 1398, the Court, in construing § 2254(d)(1), announced a rule limiting the maximum scope of the record in a state habeas petition under AEDPA, not a rule newly defining the required minimum scope of the record. As the Court put it: "[t]he State argues that review is limited to the record that was before the state court that adjudicated the claim on the merits. . . . We agree with the State. . . . We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." <u>Id.</u> Put simply, <u>Cullen</u> established a ceiling, not a floor. If it were otherwise, Rule 5 would now be in derogation of

AEDPA, yet no court has so held, nor has that rule been further amended.[8] The judgment is not void under Rule 60(b)(4) and so we deny the motion.

## III

To summarize our holdings thus far, the Court has concluded that the motion is untimely, and also determined that the Respondent's failure to file the transcripts and briefing with the Second Circuit did not violate due process. We now consider one last, important possibility: whether Claudio was actually prejudiced by the omission of these materials. Conceivably, in reviewing a district court's denial of a habeas petition, a court of appeals could be misled by exclusive reliance on the briefing of the parties, especially where, as here, the petitioner directed almost all of his energy on appeal towards a procedural issue, not the merits. Accordingly, we ask whether the Second Circuit was actually misled by Respondent's briefing. If so, and if the Second Circuit likely got the case wrong as a result, then Respondent's failure to file the state

---

[8] Claudio also claims that this Court's original determination that his petition was time-barred is inconsistent with Rivas v. Fischer, 687 F.3d 514, 552 (2d Cir. 2012), insofar as AEDPA's one-year limitations period must be tolled when the petitioner makes a "credible and compelling showing" of his entitlement to relief pursuant to 28 U.S.C. § 2244(b)(2)(B)(ii), the so-called actual innocence exception. We are not exactly sure what to make of that assertion in the context of this Rule 60(b) motion. True, the applicability of the actual innocence exception to AEDPA's one-year statute of limitations was very much at issue in Claudio's original appeal from this Court's judgment. Claudio, 74 F. App'x at 121. However, as Claudio himself notes, the Second Circuit never reached the issue of timeliness at all, instead affirming on the merits and specifically holding that sufficient evidence at trial supported his conviction. Id. at 123. Claudio's citation of Rivas as a reason to set aside the judgment would therefore be inapposite, because, ultimately, the judgment rests on the merits, not on his failure to file the petition within one year. Accordingly, we instead take Claudio's papers to assert that, if the Court were to grant the motion and vacate the judgment, the Court should further rule that Claudio's sufficiency claim is an actual innocence claim, and thus refuse to apply the one-year time-bar in light of Rivas. Because we deny the Rule 60(b) motion, we do not reach that secondary question. We note, moreover, that if Claudio wishes to bring a second and successive petition on the basis of actual innocence, he must first present that claim to the Second Circuit. See supra n. 5.

court materials, though not in derogation of due process as a general matter, might well have violated due process as applied to the facts of this case.

More specifically, in this last section, we will assume without deciding that, if a § 2254 respondent fails to file the state court briefing and trial transcript after ordered to do so, and, if a court of appeals then affirms denial of the petition based on an erroneous view of the evidence that the full record would have revealed, such that the court of appeals likely would have reached a different conclusion with the benefit of a full record, then the petitioner may be entitled to vacate the habeas judgment by reason of a due process violation under Rule 60(b)(4).[9]

We start this inquiry by quoting at length from the Second Circuit's summary of the key medical evidence presented at trial:

> Although Williams' death certificate lists the cause of death as multiple blunt impacts to the head, a subsequently performed autopsy of Williams' brain revealed that he most likely died from Diffuse Axonal Injury (DAI), a severing of the axons in the brain that occurs when the brain is suddenly moved inside the skull.
>
> The petitioner argues that medical evidence presented at trial established that, for DAI to occur, the impact must be sustained on the top or front of the head, and not the back. Additionally, the head's movement cannot be restricted for DAI to occur, although the person does not have to be standing. From this, the petitioner argues that his kicking and stomping of Williams' head did not contribute to his

---

[9] Of course, it is a rare situation in which a district court finds itself vacating a final judgment based on its perceived need to reexamine the merits when the court of appeals has already affirmed on the merits. We certainly question whether it would be appropriate for a district court to do so pursuant to Rule 60(b)(4), even under the hypothetical we have just described. But at least two of our fellow district courts, one from within our Circuit, have gone ahead and examined the expanded record when ruling on a Rule 60(b) motion alleging that the Respondent's failure to file a complete record misled the courts, even after the court of appeals had affirmed. See Reed v. Alexander, 2009 WL 2390603, at *1 (N.D.N.Y. July 31, 2009) (assuming motion was properly brought under Rule 60(b) but concluding that previously omitted transcript of sentencing proceeding did not demonstrate that no valid judgment of conviction existed); Seaton v. Jabe, 2013 WL 1664236 , at *2 (E.D. Mich. Apr. 17, 2013). This Court will do the same. And because we ultimately discern no basis to conclude that the Second Circuit was indeed misled, we do not reach the question of whether it would be appropriate to vacate the judgment if it had been.

death because, by the time Williams was on the ground, the petitioner's kicks could not have contributed to the DAI.

The government points out, however, that the medical experts agreed that DAI could be caused by multiple blows to the head, and not just a single impact, and that Evans testified that Williams's head was not on the ground when the petitioner began kicking him. The petitioner never denies that this evidence was presented to the jury.

Claudio, 74 F. App'x at 122-23.

Applying the standard for evidentiary sufficiency set forth in Jackson v. Virginia, 443 U.S. 307 (1979), the Second Circuit concluded that this proof was sufficient, without asking whether Claudio accomplished the "even more difficult task[,]" Id. at 122, of demonstrating that the state courts unreasonably applied that standard:

From this evidence, a rational juror would be free to conclude that the petitioner's kicking caused, or at least contributed to, the DAI. Indeed, one of the medical experts testified that it was probable that the victim's condition became progressively worse throughout the onslaught of punches and kicks. Moreover, a rational juror could readily infer from the nature of the petitioner's beating of Williams that the petitioner had the requisite intent to commit intentional murder. At best, the petitioner has only shown that there was conflicting evidence on whether his kicking contributed to Williams' death. And, for the evidence to be sufficient to uphold the conviction, it is, of course, enough that a jury could have reasonably resolved these conflicts in the government's favor.

Id. at 123 (footnote omitted).

The Court has reviewed the briefing and the trial transcript, and finds nothing to indicate that the Second Circuit misconstrued Claudio's causation argument, nor that it misapprehended the facts and medical evidence presented at trial, nor that it overlooked any material that would have vindicated Claudio's position on that evidence. Three witnesses offered medical testimony, key portions of which we now excerpt from the transcript:

Q [from the prosecutor]: Does [DAI] lead to death?

A [from Forensic Neuropathologist Angeline Mastri]: Usually, yes. In the more severe cases death occurs immediately at the time of impact or within a few days. Depending on also whether there are other injuries associated with it. Other

people may linger for weeks or months. Sometimes even several years. But eventually the injury itself either causes the death or they die from complications.

(Trial Tr. 710).

Q [from the prosecutor]: Could this type of injury happen when a person – if a person is lying on the ground?

A [from Dr. Mastri]: No, it has to be in motion. The head has to be in motion.

Q: Would it be fair to say then the person would have to be standing?

A: Not necessarily. [Objection overruled.] They could be kneeling. As long as the head is not restricted.

Q: And the head would be restricted if it was on the ground?

A: Yes.

(Trial Tr. 712-13).

Q [from the prosecutor]: Is there a certain number of blows that cause this injury or is it related to the number of blows?

A [from Dr. Mastri]: No.

Q: Can you explain that last answer, doctor?

A: It only takes one blow to produce this. Only one movement of the head. If there are multiple blows, it could also lead to the same thing, but it essentially can occur with one single blow.

(Trial Tr. 714).

Q [from the prosecutor]: With respect to the number of blows, as I understand you can't say which blow, but it's how many blows are needed to cause this type of injury? [Objection overruled.]

A [from Dr. Mastri]: It can happen with one blow or several blows.

Q: Would they have to be in quick succession?

A: Yes – well, one of the problems is you can't – if there are two or three blows, you don't know which one it was that did the most damage and I would guess it's the last one before the individual loses consciousness, but it may be a cumulative effect as well.

(Trial Tr. 732).

> Q [from the prosecutor]: Did the degree of injury increase with the number of blows? [Objection overruled.]
>
> A [from Neurosurgeon Dr. Michael Brismann]: I think that's hard to say. I mean it's hard – presumably yes. But it's hard to know exactly. I would say that is most likely.

(Trial Tr. 836).

> Q [from the prosecutor]: Can a determination [be] made or any opinion formulated with respect to the victim's condition prior to the last few blows?
>
> A [from Dr. Brismann]: Judging from how severe – I mean how poor the neurological condition was[.] [Objection overruled.] Again, presumably based on how diffuse the soft tissue injury to the scalp is and how the severity of the neurological injury at the time of admission to the hospital and time the emergency medical crew saw the patient, Mr. Williams, presumably there was a progressive impairment I would say throughout whatever this was that happened to him. It was so severe it's hard to believe that he would have been fine up until the last, I mean, event. It's a very severe injury and presumably it was a progressive thing.

(Trial Tr. 839).

> Q [from the prosecutor]: Now, are you familiar with that injury?
>
> A [from City Medical Examiner Dr. Aglae Charlot]: Familiar, yes.
>
> Q: Diffuse Axonal Injury?
>
> A: Diffuse Axonal Injury, yes.
>
> Q: Based upon that examination, did you – and by the way, did you do anything else in this case in order to determine cause of death?
>
> A: The cause of death was issued at the time of the autopsy before examination of the brain by the neuropathologist [i.e. Dr. Mastri] and the cause of death was attributed to multiple blunt impacts to –
>
> Q: I am sorry?
>
> A: To the multiple blunt impacts to the head and face.

Q: And did you – and is that opinion based on your opinion to a degree of medical certainty?

A: Yes.

Q: That that's the cause of death?

A: Yes.

(Trial Tr. 883-84)

Q: Well, assuming that this type of injury was the result of multiple fist blows and – could this injury be the result of multiple fist blows and kicks to the head?

A: If this injury could be the result of multiple fist blows. If all the conditions are there, yes.

Q: What type of conditions are we talking about?

A: What kind of conditions we talking about? It has to be the area of impact is very important. I mean where the impact is caused at the level of the head. The position of the head at the time of impact is also very important. And the m[o]st velocity is that produced to the brain is also important. Now, if all those conditions are in place, yes, this type of injury can be sustained as a result of blows to the face.

(Trial Tr. 889).

To be sure, there are portions of the above-quoted testimony that support Claudio's theory. For example, Dr. Mastri and Dr. Brismann seemingly disagree. Mastri's testimony mostly, but not entirely, supports the theory that the fatal DAI could only have resulted from a single blow struck when Williams was standing, not when he was on the ground (that is, Evans' first punch, not Claudio's subsequent kicks). However, the trial record unequivocally confirms that "one of the medical experts [i.e. Brismann] testified that it was probable that the victim's condition became progressively worse throughout the onslaught of punches and kicks." Claudio, 74 F. App'x at 123. In rejecting Claudio's sufficiency claim, the Second Circuit considered that testimony critical because that testimony permitted a rational juror to infer that both Evans'

initial punch _and_ Claudio's subsequent kicks initially caused and then exacerbated the DAI. Id.
In other words, this testimony allowed the jury to reject Claudio's interpretation of the evidence,
and with it his theories of causation and intent. Dr. Charlot provided an additional basis for the
jury to do so, testifying that she believed multiple blunt impacts were the cause of death even
after Dr. Mastri discovered the DAI. In short, the Second Circuit's conclusion that "[a]t best, the
petitioner has only shown that there was conflicting evidence on whether his kicking contributed
to Williams' death" comports with the trial record.

> The Second Circuit was not misled by Respondent's briefing on these points:
>
> Indeed, all three medical experts testified that DAI could be caused by multiple blows, as
> well as by a single impact (Chariot: 889; Brismann: 836; Mastri: 714). Although one
> expert testified that in order to suffer DAI the victim's head cannot be restrained, she
> explicitly stated that a person would _not_ need to be standing to suffer DAI (Mastri: 712-
> 13). Coupled with co-defendant's testimony that the victim was conscious, and that his
> head was not on the ground when petitioner began kicking him (Evans: 968, 970), the
> jury could have easily drawn the conclusion that it was petitioner's kick that caused DAI,
> or, more probably, a combination of the injuries that he sustained from both defendants.
> Indeed, one of the experts testified that it was probable that the victim's condition became
> progressively worse _through_ the onslaught of punches and kicks (Brismann: 836).
> Moreover, the cause of death listed on the victim's death certificate was "multiple
> blunt impacts to the head and face" not a single blow as petitioner repeatedly claims
> (Chariot: 884).

(Resp't's Appeal Br. 44).

We must quibble with Respondent's assertion that Dr. Mastri "explicitly stated that a
person would _not_ need to be standing to suffer DAI." She did indeed say that, but further
explained that DAI could occur when a person is kneeling, not when a person is lying down.
Nobody has ever contended that Williams was struck while kneeling. Nevertheless, that bit of
over-aggressive paraphrase, if corrected, would not likely have changed the outcome in the
Second Circuit, given the court's focus on Dr. Brismann's testimony. And the remainder of
Respondent's summary of the medical evidence appears accurate.

Claudio also asserts that the prosecutor changed his theory in summation and conceded the fact that Williams' punch alone caused the fatal DAI. However, statements of counsel are not evidence. United States v. Arboleda, 20 F.3d 58, 61 (2d Cir. 1994); People v. Parker, 814 N.Y.S.2d 818, 821 (App. Div. 2006) ("In our view, [counsel's] comments are irrelevant to the question of whether the jury's verdict is against the weight of the evidence inasmuch as comments made in summation are simply not evidence[.]"). More importantly, we do not read the prosecutor's comments as conceding anything on the element of causation:

> [The prosecutor (mislabeled in original as "The Court")]: Now, ladies and gentlemen, the judge at the end of this case is going to tell you the law of justification. . . . And you heard what happened to Steven Williams and you saw the vicious beating that was given to him around his eyes and his face. An attack that was solely directed at his head. Not at where the gun was, not bruises to his wrist, not broken fingers, the only injuries that he sustained were to his head. And you have to ask yourself what does that mean about the intentions of the [p]eople who inflicted that damage and there's no question about who they are. Those two men over there admittedly beat Steven Williams to his death. There's no question about that. And we know that was a vicious beating. Now, what did the doctors tell you?

(Trial Tr. 1084-86).

> The first thing [Dr. Mastri] told you was that this could only happen to a victim who was standing up. Right? This could not happen – she was very specific about this – this cannot happen while a victim is on the ground. Whether he is kicked hard, punched, whatever happened to him, we know that that injury occurred while he was standing up. And it could happen with one blow.

> She also told you that once that happens a victim loses consciousness. You also heard Dr. Charlot tell you that, that the instant that shearing effect happens in the mid section of the brain a person loses consciousness. Therefore, based on the medical evidence you know point number one, Steven Williams received that injury while he was standing and that he was out cold while he was standing on his feet and fell.

(Trial Tr. 1086-87).

> You also know from Dr. Brismann that because of the nature of the injuries, it was his opinion, that before the last blows were struck he was incapable of doing anything.

(Trial Tr. 1989).

20

> We know again from Dr. Mastri that whatever happened to him on the ground he was out. He was out cold. So the issues in this case is what happened while he was standing. And as I go through this testimony I want you to think about one thing. It's [the] People's position that there's no justification defense in this case. But even if you are unsure there comes a point where whatever justification you had initially is over.

(Trial Tr. 1090).

> And if Steven Williams is unconscious and not moving, just lying there like this, and Eric comes over and starts kicking him, there ain't no self-defense. There isn't any self-defense issue there because Steven Williams is out cold. He ain't reaching for a gun anymore. There's no fight. There's simply a man out cold being beaten to a pulp. And you have to ask yourself and you know the injuries this man received, if you see a man out cold, out cold and you start hitting him and hitting him and kicking him and kicking him, what is your intention? I suggest to you, ladies and gentlemen, that if a man is unconscious and suffering massive facial injuries and you chose to continue hitting him in the face and kicking him in the head, there can only be one intention and that's to kill him.

(Trial Tr. 1096-97).

The prosecutor's remarks were directed not at medical causation, but at Evans' and Claudio's justification defense (that is, their claim of self-defense) and their intent to kill. By highlighting the medical testimony that Evans' punch probably rendered Williams immediately unconscious (or at least helpless), the prosecutor meant to highlight his own contention that, even if Williams had first tried to draw a weapon, Evans and Claudio continued to rain blows upon a victim who could not conceivably have presented any continued threat. The prosecutor neither conceded nor even addressed the question of whether these subsequent blows contributed to Williams' eventual death, except to argue that there was "no question" that Evans and Claudio "beat Steven Williams to his death." Access to the transcript of the summation would most likely not have moved the Second Circuit to change its view of the evidence.

In conclusion, the Second Circuit was not misled by the State's failure to submit the full record. The motion is therefore denied. Consistent with our obligation to give a broad reading to pro se habeas filings, see, e.g., Parisi v. United States, 529 F.3d 134, 139 (2d Cir. 2008)

(Section 2255 petition), the Court has also considered whether the motion might also allege the "extraordinary circumstances" required by Rule 60(b)(6). See Stevens, 676 F.3d at 67. In our view, however, there is no material difference between the two standards as applied to this motion. Whether we cast our inquiry as a search for a due process violation under Rule 60(b)(4) or extraordinary circumstances under Rule 60(b)(6), the result is the same.

Finally, the Court does not issue a certificate of appealabililty. See Kellogg, 269 F.3d at 103 ("We thus expressly hold that the [certificate of appealability] requirement provided in 28 U.S.C. § 2253(c) applies to an order denying a Rule 60(b) motion for relief from a judgment denying a § 2254 petition"). In the Court's view, Claudio has not shown that "(1) jurists of reason would find it debatable whether the district court abused its discretion in denying the Rule 60(b) motion, and (2) jurists of reason would find it debatable whether the underlying habeas petition, in light of the grounds alleged to support the 60(b) motion, states a valid claim of the denial of a constitutional right." Id. at 104. Although, as we have explained, the question of whether Claudio brought the motion within a reasonable time is closer than appears at first glance, the Court concludes that jurists of reason would not debate that Rule 60(b) relief is unavailable, even though the State failed to provide a complete record, for the reasons we have explained in Section I and II of this memorandum.

The Clerk of Court is therefore directed to return Claudio's Rule 60(b) motion papers and exhibits, separately docket his Memorandum of Law, and provide Claudio with a copy of the original district court record.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2014

/s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge